IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
CIVIL ACTION NO. 1:21-cv-717

| | | |
|---|---|---|
| WILMER OLIVA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | COMPLAINT |
| | ) | (Jury Trial Demanded) |
| CITY OF WINSTON-SALEM, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## INTRODUCTION

1. Plaintiff Wilmer Oliva is blind and relies upon his service animal to navigate his surroundings. While shopping at Hanes Mall in Winston-Salem, North Carolina, a store manager called mall security and the police to have Mr. Oliva removed from the store due to his service animal. While mall security acknowledged Mr. Oliva's right to be in the store with his guide dog, Winston-Salem Police Department officers responded and immediately ordered Plaintiff to leave the store. Mr. Oliva explained he was the victim of disability-based discrimination, but the police officers threatened to handcuff, arrest, and jail him for trespass if he did not leave the store with his guide dog. Due to the threat of forcible arrest and detention, Mr. Oliva left the store, and the police officers issued Mr. Oliva a trespass warning. The officers further ordered Mr. Oliva to never to return to the store again or he would be arrested. When apprised of these actions, the City of Winston-Salem approved and ratified their officers' conduct.

2. Plaintiff brings this action against the City of Winston-Salem ("City") for violating Title II of the Americans with Disabilities Act and Section 504 of the Rehabilitation Act. Under these federal laws, the City is prohibited from limiting or interfering with service animal rights and is obligated to modify its policies, practices, and procedures to permit the use of service animals in public places, as well as utilize methods of administration that do not have the effect of discriminating against service animal users. The City did not comply with these federal mandates and unlawfully discriminated against Plaintiff in violation of these laws.

## JURISDICTION AND VENUE

3. Plaintiff brings this action pursuant to Title II of the Americans with Disabilities Act, 42 § 12181 *et seq.* and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

4. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343.

5. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b)(2) as the events giving rise to this action occurred in the Middle District of North Carolina.

## PARTIES

6. Plaintiff Wilmer Oliva is a resident of Forsyth County, North Carolina. Mr. Oliva is substantially limited in seeing; his blindness and need for navigation assistance is readily obvious.

7. Due to the severity of his vision impairment, Mr. Oliva relies upon the assistance of a service animal to navigate his surroundings. His current service animal is Forte, a dog professionally trained by The Seeing Eye, a philanthropic organization that breeds and trains guide dogs for blind people.

8. Defendant is a local governmental unit of North Carolina. It has a police force supervised and controlled by a Chief of Police who is appointed and controlled by the City's officials. Defendant's police force executes law enforcement policies and procedures on behalf of the City.

9. As a recipient of federal funding, Defendant is subject to Section 504 of the Rehabilitation Act. Defendant receives funds from several federal agencies, including Housing and Urban Development, the Department of Transportation, the Department of Homeland Security, the Department of Justice, the Environmental Protection Agency, the Department of Health & Human Services, and the Department of Treasury. The City received more than $22,000,000 in federal funding for fiscal year 2020.

## STATEMENT OF FACTS

10. Hanes Mall is located at 3320 Silas Creek Parkway, Winston-Salem, NC 27103. Jimmy Jazz is a retail store in Hanes Mall.

11. In October 2020, Mr. Oliva entered Jimmy Jazz accompanied by Forte. A store manager insisted he leave the store because of his dog, even after Mr. Oliva explained Forte was a service animal. Mr. Oliva left the store and contacted the North Carolina Department of Justice Consumer Protection Division to complain about the

disability-based discrimination he experienced. After Mr. Oliva filed his complaint, Jimmy Jazz assured Mr. Oliva that he and Forte could return to the store and it would post a sign in the window welcoming the inclusion of service animals.

12. After receiving these assurances, Mr. Oliva went to Jimmy Jazz with Forte on November 27, 2020. Upon seeing Mr. Oliva, the manager insisted he leave, this time because Forte was not wearing a vest indicating she is a service animal.

13. Forte was wearing a guide dog harness and handle with "The Seeing Eye" label imprinted on it.

14. Mr. Oliva explained to the store manager that Forte was his guide dog and service animal laws do not require animals to wear vests.

15. The store manager insisted that Mr. Oliva leave the store or else she would call the police. Mr. Oliva asserted his right to have his service animal with him.

16. Jimmy Jazz staff subsequently contacted both Hanes Mall security and the City's police force, the Winston-Salem Police Department (WSPD).

17. At least two Hanes Mall security employees arrived at Jimmy Jazz before the WSPD.

18. Mr. Oliva explained to the security employees that he had a right to be in public places with his service animal.

19. As an additional measure, Mr. Oliva also presented informational material about service animals to the security employees to help them understand the right to use service animals in public places.

20. The security employees agreed that Mr. Oliva did have a right to be accompanied by Forte in the store.

21. While Mr. Oliva was speaking to mall security, at least two WSPD officers arrived at Jimmy Jazz.

22. One WSPD officer immediately turned to the store manager and asked if she wanted Mr. Oliva to leave the store.

23. After the manager responded "yes," the WSPD officer turned to Mr. Oliva and ordered him to leave Jimmy Jazz.

24. The officer also asked a Hanes Mall security employee if she wanted Mr. Oliva removed from Hanes Mall.

25. The security employee, who had previously agreed with Mr. Oliva that he was permitted to have his guide dog with him in public places, indicated that she did not want Mr. Oliva removed from the mall.

26. Mr. Oliva informed the police officers that Jimmy Jazz was a public place and the store's own policy permitted the use of service animals.

27. The WSPD officers were aware from the beginning of their interaction with Mr. Oliva that the store sought his removal because of his guide dog.

28. As an additional measure, Mr. Oliva presented the WSPD officers with informational material about service animals to help them understand the right to use service animals in public places.

5

29. One of the WSPD officers told Mr. Oliva that he and his partner were not interested in service animals and information about service animals; the police officers were concerned only with the store's right to remove whomever they want for whatever reason because the store is private property.

30. One officer issued Mr. Oliva an ultimatum: "You have two options . . . to leave the store: —you can leave here on your own or you can leave here in handcuffs and you can go to jail for trespassing."

31. After the ultimatum was issued, Mr. Oliva left Jimmy Jazz.

32. Outside the store, Mr. Oliva explained to one of the officers that requiring him to leave the store because of his service animal was discrimination.

33. The officer reiterated the position that the store could exclude Mr. Oliva for any reason because it is the store's private property.

34. The WSPD officers ordered Mr. Oliva to show them his identification so they could document their trespass warning.

35. Mr. Oliva provided his identification to the officers and answered their questions as they documented the incident.

36. During their final interaction, the WSPD officers indicated to Mr. Oliva that they understood he might have a discrimination issue with the store, but that they were nevertheless trespassing him from the store and he was not to return or he would be arrested for trespass.

6

37. Through their actions and comments to Mr. Oliva, the WSPD officers evidenced an intent to enforce the stated preference of store management through trespass laws, regardless of Mr. Oliva's assertion of his right to be accompanied by his service animal, and regardless of why the store sought to eject Mr. Oliva.

38. Upon information and belief, the City has not established service animal policies, practices, and procedures to accommodate the rights of service animal users in the community.

39. Upon information and belief, the City does not train WSPD officers on the rights of service animal users in the community.

40. Upon information and belief, the City trains its police officers to employ trespass rules and procedures without regard to whether a merchant's demand for removal is based on an individual's disability or use of a service animal.

41. On January 25, 2021, Plaintiff's counsel sent a letter to Defendant advising of Mr. Oliva's ADA rights and requesting that the City remove its ongoing threat to arrest Mr. Oliva for trespass and update its police policies and procedures to protect Mr. Oliva's service animal rights.

42. On March 1, 2021, the City responded and claimed no wrongdoing by its police officers; the City asserted that its officers appropriately applied trespass rules against Mr. Oliva. The City ratified the conduct of its police officers.

43. On March 22, 2021, Plaintiff's counsel replied to Defendant's letter, once again reiterating the City's obligations under both state and federal laws to avoid discrimination when encountering service animal access disputes.

44. The City never replied to Plaintiff's March 22 letter.

45. Mr. Oliva has experienced anxiety, fear, anger, humiliation, and depression as a result of the City's actions.

## CLAIMS FOR RELIEF

### COUNT I
### Violations of Title II of the Americans with Disabilities Act

46. Plaintiff incorporates the allegations in the preceding paragraphs, as if alleged herein.

47. Plaintiff is blind and is an individual with a disability protected by the ADA, *see* 42 U.S.C. § 12102. He is qualified to receive nondiscriminatory services from the City during police interactions, *see* 42 U.S.C. § 12131(2).

48. The City is a public entity subject to Title II of the ADA, *see* 42 U.S.C. § 12131(1).

49. Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability . . . be subjected to discrimination by any such public entity." 42 U.S.C. § 12132.

50. Discrimination by a public entity includes limiting an individual "in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others" based on their disability, 28 C.F.R. § 35.130(b)(1)(vii), "coercing, intimidating, threatening, or

8

interfering" with any individual in the exercise of any right granted or protected by the ADA, 28 C.F.R. § 35.134(b), failing to "modify policies, practices, and procedures to permit the use of service animals," 28 C.F.R. § 35.136(a), and utilizing "criteria or methods of administration that have the effect of subjecting" individuals to disability-based discrimination, 28 C.F.R. § 35.130(b)(3)(i).

51. The City infringed upon Mr. Oliva's rights to use a service animal in public. *See* 28 C.F.R. §§ 35.130(b)(1)(vii) and 35.136(a).

52. The City interfered with Mr. Oliva's right to be accompanied by his service animal in public places. *See* 28 C.F.R. § 36.302(c)(7).

53. The City has failed to adequately modify its trespass enforcement policies, practices, and procedures to permit the lawful use of service animals in public places. *See* 28 C.F.R. §§ 35.130(b)(7)(i) and 35.136(a), and 36.302(c). It has similarly failed to train its officers on how to respond to service animal disputes without violating anti-disability discrimination laws.

54. The City's policy, practice, and/or procedure to remove service animal users from public places through trespass enforcement unlawfully utilizes "criteria or methods of administration" that subject service animal users to disability-based discrimination. *See* 28 C.F.R. § 35.130(b)(3)(i).

55. The Defendant has acted with intent and/or deliberate indifference.

56. Plaintiff was harmed by the City's discriminatory actions and is entitled to compensatory damages, as well as reasonable attorneys' fees and costs.

## COUNT II
## Violations of Section 504 of the Rehabilitation Act

57. Plaintiff incorporates the allegations in the preceding paragraphs, as if alleged herein.

58. Plaintiff is blind, an individual with a disability protected by Section 504 of the Rehabilitation Act, and qualified to receive nondiscriminatory services from the City during police interactions. *See* 29 U.S.C. § 794(a).

59. In enacting Section 504 of the Rehabilitation Act of 1973, Congress established "the policy of the United States" that all entities receiving federal funding must execute their activities in ways that demonstrate "respect for the privacy, rights, and equal access" of individuals with disabilities. 29 U.S.C. § 701(c)(2).

60. The City is a recipient of federal financial assistance from several federal agencies, including Housing and Urban Development, the Department of Transportation, the Department of Homeland Security, the Department of Justice, the Environmental Protection Agency, the Department of Health and Human Services, and the Department of Treasury, and the City is subject to Section 504 of the Rehabilitation Act and its implementing regulations. *See* 29 U.S.C. § 794; 24 C.F.R. § 8; 49 C.F.R. § 27; 28 C.F.R. § 42.502; 40 C.F.R. § 7; 45 C.F.R. § 85; and 31 C.F.R. § 17.

61. Section 504 of the Rehabilitation Act states: "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded

from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

62. Discrimination by a recipient of federal funds includes limiting an individual in the enjoyment of any right, privilege, advantage, or opportunity enjoyed by others based on their disability; coercing, intimidating, threatening, or interfering with any individual in the exercise of any right granted or protected by the ADA; failing to modify policies, practices, and procedures to permit the use of service animals; and utilizing criteria or methods of administration that have the effect of subjecting individuals to disability-based discrimination. 29 U.S.C. § 794(a); *see also* 24 C.F.R. §§ 8(b)(1)(viii) and (4); 49 C.F.R. §§ 27.7(b)(1)(v), (1)(vii), and (4)(i); 28 C.F.R. § 42.503(b)(1)(i), (1)(vii), and (3); 40 C.F.R. § 7.5(a)(5) and (b); 45 C.F.R. § 85.21(b)(1)(vi) and (3)(i); and 31 C.F.R. § 17.130(b)(1)(vi) and (4)(i).

63. The City infringed upon Mr. Oliva's rights to use a service animal in public.

64. The City interfered with Mr. Oliva's right to be accompanied by his service animal in public places.

65. The City has failed to adequately modify its trespass enforcement policies, practices, and procedures to permit the lawful use of service animals in public places. It has similarly failed to train its officers on how to respond to service animal disputes without violating anti-disability discrimination laws.

66. The City's policy, practice, and/or procedure to remove service animal users from public places through trespass enforcement unlawfully utilizes "criteria or methods of administration" that subject service animal users to disability-based discrimination.

67. The Defendant has acted with intent and/or deliberate indifference.

68. Plaintiff was harmed by Defendant's discriminatory actions and is entitled to compensatory damages, as well as reasonable attorney fees and costs.

PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court grant the following relief:

1. Declare that Defendant violated Title II of the Americans with Disabilities Act;

2. Declare that Defendant violated Section 504 of the Rehabilitation Act;

3. Afford Plaintiff a trial by jury;

4. Enter judgment in Plaintiff's favor;

5. Award Plaintiff compensatory damages pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12133;

6. Award Plaintiff the costs of this action and reasonable attorneys' fees pursuant to 29 U.S.C. § 794a and 42 U.S.C. § 12205; and

7. Provide such other and further relief as the Court deems to be just and equitable.

Respectfully submitted this the 15th day of September, 2021.

        /s/ Christopher Hodgson

        Christopher Hodgson, N.C. State Bar No. 50135
        Lisa Grafstein, N.C. State Bar No. 22076
        Elizabeth Myerholtz, N.C. State Bar No. 54612
        Disability Rights North Carolina
        3724 National Drive, Suite 100
        Raleigh, NC 27612
        Phone: 919-856-2195
        Fax: 919-856-2244
        chris.hodgson@disabilityrightsnc.org
        lisa.grafstein@disabilityrightsnc.org
        elizabeth.myerholtz@disabilityrightsnc.org

        *Attorneys for Plaintiff*